UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL ANN PITTENGER,

              Plaintiff,          CIVIL ACTION NO. 11-cv-15311

    vs.

                         DISTRICT JUDGE MARIANNE O. BATTANI

COMMISSIONER OF         MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

              Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Cheryl Pittenger seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to disability insurance benefits under 42 U.S.C. § 405. (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 9) and Defendant's Motion for Summary Judgment (docket no. 10). The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 2.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

## I.    RECOMMENDATION:

Because the Court finds that substantial evidence supports Defendant's final decision denying Plaintiff's request, the Court recommends that Plaintiff's motion for summary judgment be DENIED (docket no. 9), that Defendant's motion for summary judgment be GRANTED (docket no. 10), and that this case be DISMISSED.

## II.    PROCEDURAL HISTORY:

Plaintiff filed an application for Disability Insurance Benefits with a protective filing date of October 23, 2007, alleging that she had been disabled since March 1, 1999, due to a brain tumor. (TR 78-90.) The Social Security Administration denied benefits. (TR 45.) Plaintiff requested a *de novo* hearing, which was held on October 27, 2010, before Administrative Law Judge (ALJ) Trevor Skarda, who subsequently found that the claimant was not entitled to Disability Insurance Benefits because Plaintiff was not suffering from a medically determinable impairment before her date last insured, June 30, 2001. (TR 17-20.) The Appeals Council declined to review the ALJ's decision (TR 1-4), and Plaintiff commenced the instant action for judicial review. Plaintiff filed her Motion for Summary Judgment (docket no. 9), and Defendant filed his Motion for Summary Judgment in opposition to Plaintiff's Motion (docket no. 10).

## III.   PLAINTIFF'S TESTIMONY AND MEDICAL EVIDENCE

### A.      Plaintiff's Testimony

Plaintiff was forty years old at the time of the administrative hearing and twenty-nine years old at the time of the alleged onset of her disability. (TR 15.) Plaintiff has a high-school education and experience working as a receptionist. (TR 38, 40.) Plaintiff claims that she hasn't worked since March 1999 due to headaches, dizziness, and imbalance caused by a brain tumor. (TR 38-39.) At the time of her hearing, Plaintiff had no source of income, although she did try to work between 2003 and 2004. (*See* TR 38.) Plaintiff testified that she has two adopted children by her ex-husband and no biological children. (TR 41.)

Plaintiff testified that she began experiencing dizziness, headaches, and imbalance in March 1999. (TR 38.) She left her job voluntarily because she "just didn't think it was fair to an employer, because [she] never know on a day-to-day basis whether or not [she] could function to the ability they needed [her] to." (TR 38.) Plaintiff indicated that "[t]here were several days where [she] had

2

to call [her employer] to cover [her] so that [she] could go home" because of anxiety attacks and the onset of migraine headaches. (TR 39.) Plaintiff testified that she saw her primary care physician, Dr. Valerie Duerr, and a chiropractor for these problems in addition to back and leg pain. (TR 39-40.) Plaintiff testified that her symptoms got progressively worse until, on May 13, 2007, she was diagnosed with a brain tumor. (TR 40.)

**B.    Medical Record**[1]

In March 1998, Plaintiff was treated for ureteral calculus (stone in the ureter), which was later described as a kidney stone (Tr. 297, 347-51). In November 1998, Plaintiff presented to Dr. Valerie Duerr with complaints of sore throat, headaches, sinus drainage, and a low grade fever (Tr. 296). The doctor diagnosed an upper respiratory tract infection and prescribed medications (Tr. 296).

In June 2000, Plaintiff presented to Dr. Duerr with complaints of right flank pain and some burning on urination (Tr. 296). Dr. Duerr stated she possibly had a urinary tract infection or stone formation; Dr. Duerr ordered tests and prescribed medication (Tr. 296). Later that month, Dr. Duerr treated Plaintiff for dysuria (painful or difficult urination) and pharyngitis/upper respiratory infection (Tr. 295).

Plaintiff apparently visited a chiropractor on a regular basis in November and December 2002 for treatment of headaches and neck and back pain (Tr. 535-36). In January 2003, Plaintiff presented to Dr. Duerr with complaints of dizziness, nausea, diarrhea, and feeling light-headed for one week (Tr. 291). Dr. Duerr diagnosed pharyngitis (Tr. 291). Plaintiff called Dr. Duerr's office twice more that month with complaints of dizziness and nausea (Tr. 291). Plaintiff returned to Dr. Duerr near the end of the month and stated that she felt very dizzy with certain movements (Tr. 290). She stated that "[s]he never had this problem before" (Tr. 290). Dr. Duerr diagnosed vertigo, probable viral labyrinthitis, and prescribed medications (Tr. 290).

In February 2003, Plaintiff presented to Dr. Nasser Sabbagh, a neurologist, and reported that she had dizziness with movement, which started on January 4, 2003 (Tr. 183). Plaintiff stated that it was associated with severe nausea, weakness,

---

[1]Defendant's Brief in support of his Motion sets forth Plaintiff's medical history clearly and completely. (*See* docket no. 10 at 5-8.) Plaintiff does not discuss her medical history in detail, but her Brief in support of her Motion does not appear to contradict the record as set forth in Defendant's brief; Plaintiff merely questions the ALJ's characterization of the evidence. (*See* docket no. 9 at 5-6.) Thus, the Court will adopt Defendant's description of Plaintiff's medical history verbatim.

3

imbalance, achiness, diarrhea, and vomiting (Tr. 183). After an examination, Dr. Sabbagh opined that Plaintiff's symptoms were related to anxiety/hyperventilation (Tr. 184). Plaintiff followed-up with Dr. Sabbagh later that month and stated that her dizziness had resolved, but that she still had some balance problems and chest symptoms (Tr. 182). Dr. Sabbagh opined that Plaintiff's dizziness was benign and recommended no further investigation (Tr. 182). On three occasions between March and August 2003, Plaintiff presented to Dr. Duerr for treatment of anxiety/panic disorder and was prescribed an anti-depressant; Plaintiff reported that the drug helped, but that she still had occasional panic attacks (Tr. 288-90).

In November 2003, an ENT specialist noted that Plaintiff had received ENG testing (balance testing) due to complaints of recurring dizziness and persistent imbalance; the doctor diagnosed benign paroxysmal positional vertigo (Tr. 185). During appointments between December 2003 and March 2005, Plaintiff complained to Dr. Duerr of anxiety, headaches, and vertigo; Dr. Duerr managed Plaintiff's anxiety medications (Tr. 282-87). During that period, Plaintiff received treatment from a psychiatrist for panic disorder and saw a therapist for symptoms of severe anxiety and panic (Tr. 188-89). In November 2004, Plaintiff received physical therapy due to vertigo (Tr. 232). In July 2005, Plaintiff had bilateral typanostomy tube placement surgery to treat eustachian tube (an auditory tube) dysfunction (Tr. 233).

Between October 2005 and October 2006, Plaintiff visited treatment providers at Saint Mary's Vassar Family Physician on several occasions for a variety of conditions, including anxiety, dizziness, nausea, and ear pain and pressure (Tr. 198-99, 205-15, 224-28). In September 2006 and April 2007, Plaintiff underwent bilateral typanostomy tube placement surgery two more times to treat chronic otitis media (fluid in the middle ear) (Tr. 235-36).

On May 10, 2007, Plaintiff presented to Dr. Asif Ishaque with complaints of headaches, visual symptoms, dizziness, and poor balance (Tr. 554). Although not entirely clear, Plaintiff may have reported a six-year history of vertigo and dizziness (Tr. 554). Dr. Ishaque ordered a brain MRI (Tr. 554). The MRI revealed that Plaintiff had a mass in her brain (Tr. 449). The next month, Dr. Roy Torcuator described Plaintiff's course of treatment for the tumor (Tr. 272-73). Dr. Torcuator noted that Plaintiff had presented with a long-standing history of dizziness, imbalance, and blurred vision since January 2002, which had been treated as an inner ear disease with no improvement (Tr. 272). He stated that Plaintiff had also mentioned "drunk-like vision" with gait ataxia (Tr. 272). Dr. Torcuator reported that after the May 2007 MRI revealed a brain lesion, Plaintiff underwent surgery to remove it (Tr. 272). After surgery, Plaintiff had diplopia (double vision) (Tr. 273). Dr. Torcuator noted that a post-surgical MRI showed no residual disease, but the neurosurgeon had reported some remaining microscopic tumor (Tr. 273). Plaintiff reported to another oncologist that month that she had symptomatic vertigo for five years (Tr. 268).

4

Thereafter, Plaintiff continued to follow-up with Dr. Ishaque for her chronic conditions, including headaches, dizziness, depression, and anxiety (Tr. 357-364, 402-03, 458-61). Plaintiff also regularly visited Dr. Jawad Shah for follow-up regarding the removal of her tumor (Tr. 391-400). Plaintiff reported hallucinations, which later resolved, vision problems, headaches, and dizziness (Tr. 391-400).

(Docket no. 10 at 5-8.)

## IV.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through June 30, 2001, and that she had not engaged in substantial gainful from the date of her alleged onset, March 1, 1999, through June 30, 2001. (TR 17.) The ALJ, however, found that during this period, "there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." (TR 17.) Therefore, Plaintiff was not suffering from a disability under the Social Security Act at any time from the time of her alleged onset through her date last insured. (TR 20.)

## V.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human*

5

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.     Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     Plaintiff was not presently engaged in substantial gainful employment; and

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203

6

F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    Analysis

To establish entitlement to disability insurance benefits, Plaintiff must show that she was under a disability within the meaning of the Social Security Act before her date last insured. *See Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1998). Part of this burden includes establishing the existence of a medically determinable physical or mental impairment. 42 U.S.C. § 423(d)(1)(A). Plaintiff claims that she was unable to work from March 1999 through June 30, 2001, due to an undiagnosed brain tumor. (Docket no. 9 at 5.) Thus, Plaintiff must establish that the brain tumor (or the symptoms thereof) existed before June 30, 2001.

The ALJ determined that while Plaintiff's brain tumor was not diagnosed until May 2007, her symptoms "date[] back to June 2002 at the earliest and most probably January 2003." (TR 19.) The ALJ found that there was "a paucity of medical evidence on or prior to June 30, 2001." (TR 18.) With the exception of "right flank pain" due to what was likely a kidney stone, Plaintiff's only visit to a doctor for "symptoms of vertigo, inner ear complaints, dizziness, migraine headaches [or] anxiety" was her 1998 visit to Dr. Duerr for a headache, sore throat, body aches, and sinus drainage, which Dr. Duerr diagnosed as an upper respiratory infection. (TR 18.) Her next complaint of a headache was in or about November 2002. (TR 18.)

Plaintiff argues that she "should not be penalized by her doctors not listening to her nor

going the extra mile and sending hr (sic) for tests that would have shown the brain tumor prior to 2007. . . . her brain tumor was in fact there prior to 2001 but it just was not diagnosed." (Docket no. 9 at 5.)  In support of this contention, Plaintiff cites to her medical record in general and states that "[t]hroughout the medical records they sent her for inner ear testing, inner infections with dizziness; she was placed on medication for the dizziness but it never really helped her symptoms" (*Id.* (citing TR 279-83; 231-72).)  This statement is accurate, but as Defendant contends, "she does not cite to any evidence that she reported any of those symptoms to her doctors before [June 30, 2001]." (Docket no. 10 at 11.)

The ALJ noted that Plaintiff first reported signs of vertigo and dizziness in January 2003. (TR18.)  Plaintiff even told Dr. Duerr that she "never had this problem before."  (TR 290.) Moreover, additional records confirm that her symptoms began in early 2003: Plaintiff told a neurologist in February 2003 that her symptoms started on January 4, 2003. (TR 183.)  As the ALJ discussed, Plaintiff's symptoms appear to have grown progressively worse from January 2003 through May 2007, but with the exception of a single headache in 1998 and her testimony at the October 27, 2010 hearing, nothing in the record indicates that her symptoms started before June 30, 2001.  (TR 18-20.)  And even if a scintilla of evidence did exist to support Plaintiff's argument, substantial evidence exists to support the ALJ's decision.  Therefore, the Court recommends denying Plaintiff's Motion and granting Defendant's Motion.

## VI.   CONCLUSION

For the above-stated reasons, the Court recommends DENYING Plaintiff's motion for summary judgment, GRANTING Defendant's motion for summary judgment, and DISMISSING this case.

### REVIEW OF REPORT AND RECOMMENDATION

8

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 22, 2013          s/ Mona K. Majzoub
                                 MONA K. MAJZOUB
                                 UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 22, 2013          s/ Lisa C. Bartlett
                                 Case Manager

9